235 So.2d 20 (1970)
Alfred E. CORRERIA, Appellant,
v.
The ORLANDO BANK & TRUST COMPANY and William C. Hooker, Jr., d/b/a Prestige Cars, Appellees.
No. 69-557.
District Court of Appeal of Florida, Fourth District.
May 6, 1970.
*21 Jack B. Nichols, of Gurney & Skolfield, Winter Park, for appellant.
Robert J. Pleus, Jr., of Andrews, Smathers, Tepper & Pleus, Orlando, for appellee Orlando Bank & Trust Co.
CROSS, Chief Judge.
Appellant-plaintiff, Alfred E. Correria, appeals a final judgment entered in favor of the appellee-defendant, The Orlando Bank & Trust Company, in an action for declaratory relief and for foreclosure of a lien on an automobile. We reverse.
The plaintiff, Alfred E. Correria, in the year 1968 purchased a used Cadillac automobile from William C. Hooker, Jr., a retail automobile dealer doing business as "Prestige Cars" in Orlando, Florida. Prior to the purchase of this vehicle by the plaintiff, the defendant, The Orlando Bank & Trust Company, under a trust agreement "floor-planned" the purchase of automobiles for resale by William C. Hooker, Jr. In that regard, the bank obtained from Mr. Hooker, in addition to the trust agreement, a promissory note.
At the time of signing the trust agreement there was described therein only a 1963 Buick automobile. However, it was the practice and was so understood by Mr. Hooker and the bank that subsequent purchases of automobiles by Mr. Hooker for resale would be added to the trust agreement. Upon purchase of automobiles from time to time by Mr. Hooker, the title certificate would be endorsed by the seller in blank on the back of the title. This title certificate would then be delivered by Mr. Hooker to the bank, which would then in turn note a description of the automobile on the trust agreement and then deposit a *22 sum of money to Mr. Hooker's account to cover the purchase price. This is essentially what happened with the automobile purchased by the plaintiff. The original owner sold the automobile to Mr. Hooker and delivered the title certificate to him and signed the certificate in blank on the back. The certificate of title was thereafter delivered to the bank, a deposit was then made to the account of Mr. Hooker, and the Cadillac was added to the trust agreement.
Upon purchasing the car, the plaintiff took possession of it, and at the time for renewal of the license plate for the car, plaintiff for the first time discovered that the certificate of title had never been transferred to his name. The plaintiff then began to demand delivery of the title certificate, at which time he learned that the bank held the title certificate and claimed an interest in the automobile for money previously loaned in accordance with the trust agreement.
Upon the bank's refusal to surrender the title, the plaintiff instituted this declaratory action to establish the plaintiff's right to the title certificate of the automobile as being superior to that of the bank. Plaintiff also sought to compel the bank to deliver the certificate of title to him.
In answer to the plaintiff's complaint, the bank denied plaintiff's claim and filed a counterclaim against the plaintiff to foreclose a lien upon the automobile as Mr. Hooker had defaulted on the note and was in breach of the agreement. Final judgment of foreclosure was entered in favor of the bank, which judgment determined the amount due and owing to the bank by Mr. Hooker, and provided that the sum be paid within five days from the date of the judgment, and upon failure so to pay, the automobile was to be sold at public sale to the highest and best bidder. Hence this appeal.
The basic issue with which we are confronted by this appeal is whether when one purchases an automobile from an automobile dealer's inventory in the ordinary course of business without notice of a trust security agreement between the dealer and a financial institution, does that purchaser acquire title free of the bank's trust security lien?
The Uniform Commercial Code, known as ch. 671 through 680, Florida Statutes, which became effective at 12:01 a.m. on January 1, 1967, applies to a transaction which was entered into and which event occurred subsequent to that date. The Uniform Commercial Code in 672.2-403 under the heading "Power to transfer; good faith purchase of goods; `entrusting,'" provides "(1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with a voidable title has power to transfer a good title to a good faith purchaser for value * * * (2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business; (3) `Entrusting' includes any delivery and any acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence and regardless of whether the procurement of the entrusting or the possessor's disposition of the goods have been such as to be larcenous under the criminal law."
The situations in which a buyer in the ordinary course of business from a dealer has been protected against reservation of property or other hidden interests are gathered by subsection (2). The guiding principle appears now to be to protect persons who buy in the ordinary course out of inventory. Consignors have no reason to complain, nor have lenders who hold the security interest in the inventory, since the very purpose of the goods in inventory is to be turned into cash by sale. The purpose and intent of Section 672.2-403 is to *23 extend by the law of Florida further protection to bona fide purchasers of goods.
William D. Warren in his article, "Cutting Off Claims of Ownership Under the Uniform Commercial Code," 30 Univ. of Chicago Law Review 469, 1962, states at page 472:
"In Section 2-403 of the Code, the bold decision is made to apply in a limited form at least the commercial or mercantile theory to goods. Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him the power to transfer all rights of the entruster to a buyer in the ordinary course of business. The buyer in the ordinary course of business is one who in good faith buys goods from a person in the business of selling goods of that kind, * * *
"The effect of these provisions is that when goods are sold in an unquestionably commercial setting, they are to be given a high degree of negotiability."
Section 679.9-307, Florida Statutes, entitled "Protection of Buyers of Goods" reads as follows:
"(1) A buyer in ordinary course of business (§ 671.1-201(9)) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." (Emphasis added.)
The official comments accompanying this section of the Code indicate quite clearly the intention of the drafters of the Code was for a buyer in ordinary course of business, that is, one who buys "in good faith and without knowledge that the sale to him is in violation of the ownership rights for security interest of a third party," to take free of a security interest, even though perfected, and although he knows the security interest exists.
In the instant case we have a situation where the plaintiff purchased an automobile from Mr. Hooker, who was in the business of selling automobiles and had sold to the plaintiff two automobiles in the past. There is no question that Mr. Hooker, doing business as Prestige Cars was an automobile dealer, nor could there be any question that the plaintiff dealt with Mr. Hooker on the basis that he was an automobile dealer. The record does not reveal that in the course of dealings between the plaintiff and Mr. Hooker, the plaintiff did have knowledge or should have been put on notice that something was unusual about the sale of this car or the sale of any prior car to the plaintiff, or that a third party had some interest in the vehicles.
As for the bank, it had knowledge that Mr. Hooker was selling cars out of inventory. The bank was aware of this practice and dealt with Mr. Hooker on this basis. We certainly cannot envision the defendant-bank entering into such a relationship with Mr. Hooker without ascertaining that Mr. Hooker was in fact selling these cars out of his inventory. The Consumer Loan Officer of the bank was fully aware of the "floor-planning" of Mr. Hooker, and in fact made periodic checks of the inventory to ascertain whether any vehicles had been sold without an accounting to the bank for the proceeds. Moreover, the trust agreement between Mr. Hooker and the defendant-bank recites in one instance that the trustee, i.e., Mr. Hooker, shall keep the merchandise and the proceeds thereof for the account of the entruster, i.e., the bank; and in another, that the bank may at any time cancel the trust and take possession of the said merchandise and any proceeds thereof.
Thus it is obvious from the trust agreement that Mr. Hooker did exactly what was expected of him by the bank, i.e., he sold a car to a buyer (the plaintiff, Mr. Correria) in the ordinary course of *24 business[1] out of an inventory of goods in which kind Mr. Hooker dealt. Any security interest of the bank is thereafter cut off. This determination enjoys support in the majority of jurisdictions. Humphrey Cadillac & Oldsmobile Co. v. Sinard, 1967, 85 Ill. App.2d 64, 229 N.E.2d 365; Charles S. Martin Distributing Co. v. Banks, 1965, 111 Ga. App. 538, 142 S.E.2d 309; Weisel v. McBride, 1959, 191 Pa.Super. 411, 156 A.2d 613; Sterling Acceptance Co. v. Grimes, 1961, 194 Pa.Super. 503, 168 A.2d 600; Associates Discount Corp. v. Old Freeport Bank, 1966, 421 Pa. 609, 220 A.2d 621; 17 A.L.R.2d 1011, § 51 [b].
The contention of the defendant-bank that the Uniform Commercial Code does not apply to this transaction and that the transaction should be governed pursuant to F.S. Section 319, F.S.A., Title Certificates,[2] does not impress us. The main thrust of the bank's argument in support of this contention is that Section 319.22(1) should govern this situation. Section 319.22(1) reads as follows:
"319.22 Transfer of title. 
"(1) Except as provided in §§ 319.21 and 319.28, no person acquiring a motor vehicle from the owner thereof, whether such owner be a dealer or otherwise, hereafter shall acquire a marketable title in or to said motor vehicle until he, she, or it shall have had issued to him, her or it a certificate of title to said motor vehicle; nor shall any waiver or estoppel operate in favor of such person against a person having possession of such certificate of title or an assignment of such certificate for said motor vehicle for valuable consideration. Except as otherwise provided herein, no court in any case at law or in equity shall recognize the right, title, claim or interest of any person in or to any such motor vehicle, hereafter sold or disposed of, or mortgaged or encumbered, unless evidenced by and on a certificate of title duly issued, in accordance with the provisions of this law." (Emphasis added.)
It has been settled law in this jurisdiction for many years, as well as in other jurisdictions, that the failure of the purchaser to obtain the title certificate at the time of the sale does not prevent the passage of title from the seller to the buyer. Motor Credit Corporation v. Woolverton, Fla. 1957, 99 So.2d 286; Palmer v. R.S. Evans, Jacksonville, Inc., Fla. 1955, 81 So.2d 635; Ragg v. Hurd, Fla. 1952, 60 So.2d 673. F.S. Section 319.22(1), F.S.A., provides that a purchaser shall not acquire a "marketable" title until the certificate of title is issued to him. The statute does not provide that no valid title shall be perfected until a purchaser obtains a title certificate.
The bank further contends that mere possession of the certificate of title itself gave them a secured interest in the automobile. Such is at best a specious argument. The bank has cited no authority supporting this contention. In fact, the contention that merely possession of an original certificate of title vests a security interest in the holder thereof flies in the face of our sister Third District Court of Appeal's opinion in Coplan Pipe & Supply Co. v. McCann, Fla.App. 1961, 132 So.2d 632. Under the facts of this case it is our opinion there is no conflict or inconsistency between ch. 319 and the Uniform Commercial *25 Code, and that the controlling law should be the Uniform Commercial Code.
Even apart from the Uniform Commercial Code or F.S. ch. 319, F.S.A., we determine this situation calls for the application of a very old universally accepted principle that "when one of two persons must suffer through the fraud of a third person, the one who made it possible for the fraud to be perpetrated must bear the loss." Glass v. Continental Guaranty Corp., 1921, 81 Fla. 687, 88 So. 876, 25 A.L.R. 312. The bank is in the position of one who made possible the perpetration of a fraud and should rightly bear the loss. To inflict the plaintiff with such a burden does violence to the principles of justice.
Accordingly, the judgment is reversed and the cause remanded with directions to enter a judgment in favor of the plaintiff, Alfred E. Correria, and against the defendant, The Orlando Bank & Trust Company, consistent with the views herein expressed.
Reversed and remanded with directions.
OWEN, J., concurs.
WALDEN, J., dissents, with opinion.
WALDEN, Judge (dissenting).
The critical underlying issue was whether or not plaintiff had actual or constructive notice concerning the financing arrangement between the seller, Hooker, and the Bank. At the conclusion of the hearing the trial court announced, "I would hold that Mr. Correria had notice of whatever rights the Orlando Bank had."
The record shows by way of circumstantial support of such notice that, after possession was delivered, the seller retrieved the car with plaintiff's permission to take it and show it to the Bank as "* * * [T]he bank wanted to look at something." Plaintiff never obtained or saw a title certificate. The seller told plaintiff that he was going to get the title certificate from Bob Paice at the Orlando Bank and Trust Co. This was the third vehicle plaintiff had purchased from the seller and the first two had been to the knowledge of plaintiff financed with Bob Paice of the Orlando Bank and Trust Co. The plaintiff telephoned Bob Paice at the Orlando Bank and Trust Co. to see if he would finance the car for plaintiff. While there is some ambiguity, the plaintiff testified at one place that Paice told plaintiff that the seller bought and financed with them. Plaintiff was a mobile home salesman for at least three years and it may be inferred that he had some knowledge of financing practices. The plaintiff never signed or asked to sign a title application as required by F.S. 319.23(5), F.S.A.
It is basic that the judgment comes to us with a presumption of correctness. The judgment being supported by adequate competent evidence, I would affirm.
NOTES
[1] A buyer in the ordinary course of business is defined in F.S. Section 671.1-201 (9), F.S.A., as meaning "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. * * *"
[2] The Uniform Commercial Code, § 680.10-104(2) provides that certain enumerated laws and parts of laws, including ch. 319, are specifically not repealed and shall take precedence over any provisions of the Code that may be inconsistent or in conflict therewith.